

U.S. Department of Justice

United States Attorney
*Eastern District of New York*

NB:JMM

*610 Federal Plaza*
*Central Islip, New York 11722*

May 6, 2014

By ECF with Courtesy Copy by Interoffice Mail

The Honorable Gary R. Brown
United States Magistrate Judge
Eastern District of New York
844 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Aaron Wider et al.
     Criminal No. 14-221(ADS)(GRB)

Dear Judge Brown:

  The government respectfully submits this letter in support of its motion for a permanent order of detention with regard to defendant Aaron Wider in the above-captioned case. For the reasons set forth below, the government requests that defendant Aaron Wider be detained pending trial pursuant to 18 U.S.C. § 3142(e). The government also submits this letter in advance of the arraignments and bail determinations of all defendants arrested in this matter earlier today.

I. RELEVANT LEGAL STANDARDS FOR DETENTION

  As the Court is well-aware, the Bail Reform Act authorizes pretrial detention where a court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." United States v. Agnello, 101 F. Supp.2d 108, 109 (E.D.N.Y. 2000). Among the factors to consider in determining whether conditions exist to insure the return of the defendant and/or safety of the community are:

  (1) The nature and circumstances of the offense charged;

  (2) The weight of the evidence against the person;

  (3) The history and characteristics of the person, including--

      (A)    the person's character, . . . , past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings . . . ; and

      (B)    Whether, at the time of the current offense . . . , the person was on . . . probation  . . or on other release . . . for an offense under Federal, State, or local law; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. §3142(g).

Detention may be ordered on risk-of-flight grounds if the government establishes such grounds by a preponderance of the evidence. United States v. Chimurenga, 760 F.2d 400, 405-06 (2d Cir. 1985). Detention may be ordered on dangerousness grounds if the government establishes such grounds by clear and convincing evidence. See 18 U.S.C. § 3142(f)(2). The rules governing admissibility of evidence at trial, however, do not apply in a detention hearing. Id.; Fed.R.Evid. 1101(d)(3).

## II. STATEMENT OF FACTS

### A. The Mortgage Fraud Scheme And Role of the Defendants

The indictment charging bank fraud conspiracy arises out of a grand jury investigation led by this Office and the FBI into a $30 million mortgage fraud scheme masterminded by the defendant Wider.

Wider was president and sole shareholder of a New York State licensed mortgage bank in Garden City, New York named HTFC Corp. Neither Wider nor HTFC possessed any significant assets to originate loans. Rather, Wider and his bank relied on a line of credit with large institutions, commonly called "Warehouse Lenders," to provide the funding for mortgages that would be issued by HTFC.

Normally, a mortgage bank like HTFC would review the loan applications of prospective borrowers, ascertain their creditworthiness, and insure that the property being purchased was of sufficient market value to collateralize a mortgage. That information would then be forwarded by the mortgage bank to the Warehouse Lenders to obtain funding for specific mortgages.

Upon getting funding and issuing the mortgage, HTFC could service the loan or sell it to investors in the secondary mortgage market. In this case, Wider sold every one of HTFC's mortgages to other financial institutions. Mortgages of the kind issued by HTFC were, at least until the financial meltdown of 2007-08, attractive to institutional investors. As so-called "stated" income and asset loans, HTFC's mortgages bore relatively high interest

2

rates (approximately 7% to 10%) and yet were seemingly safe investment options because the loans were represented by Wider and the co-conspirators to be fully collateralized by the real property as well as the incomes and assets of the purchasers. Upon buying a mortgage, the secondary market institution paid off the Warehouse Lender, and then either serviced the loans themselves, or bundled the notes with others into collateralized mortgage obligations or mortgage-backed securities that would be re-sold to other investors such as hedge funds or pension funds.

   In this case, Wider acted not only as banker, but also as mortgagor or borrower on some 26 fraudulent real estate transactions. Wider also recruited others to act as buyers, (including co-defendants Manjeet Bawa, Joseph Ferrara and John Petiton,) to get funding to buy houses in Nassau and Suffolk counties through HTFC mortgages. The conspirators, including Wider, repeatedly lied about their incomes, manufactured the balances in bank accounts and other assets they claimed to own, and concealed their liabilities, including judgments against them in prior civil litigation, on HTFC loan applications. Those applications were then forwarded to the Warehouse Lenders.

   Wider and the coconspirators then engineered a series of sham transactions on the day they closed on home purchases from innocent third party sellers. The purpose of the sham transactions was to artificially-inflate the purported home prices and the supposed market value of the collateral in order to borrow sums of money that were 80% more than the true purchase price of the homes. Co-defendants John Petiton and Eric Finger, both attorneys admitted to practice law in New York, as well as Joseph Mirando, a New York licensed real estate appraiser, created phony contracts, closing settlement statements, trust agreements and appraisal reports to obtain funding from the Warehouse Lenders for amounts that far exceeded the collateral value of the homes.

   The following summarizes one purchase on March 12, 2006 of a Massapequa, New York home in which Ferrara acted as a straw purchaser:

- Ferrara contracted to buy the home from an innocent third-party seller at the negotiated price of $360,000.

- Ferrara completed an HTFC loan application requesting funding for a mortgage to buy the same home at the inflated price of $650,000. Ferrara and Wider falsified the statement of assets and income, and the application was forwarded to the Warehouse Lenders.

- Real estate appraiser Joseph Mirando prepared an appraisal justifying the $650,000 mortgage request by, among other things, misstating the true sales price and using higher-priced sales as "comparables." In one instance, to justify an inflated purchase price, Mirando favorably compared a dilapidated house located on a truck route adjacent a gas station to a waterfront home with a private boat dock.

3

- Based on the false HTFC loan application, the Warehouse Lenders approved funding for up to 80% of the inflated sales price, that is, approximately $611,000.

- At closing, attorney John Petiton oversaw Ferrara's purchase from the innocent seller at the price of $360,000, and then immediately executed a trust agreement, deed transfer and other documentation to create a false paper trail documenting the inflated transaction of $650,000.

- Simultaneously, HTFC settlement attorney, Eric Finger, who received $611,000 in wire transfers from the Warehouse Lenders, prepared a settlement statement known as a HUD-1 in which he concealed the lower, true sales price, and fabricated a down payment that Ferrara supposedly made towards the $650,000 fraudulent transaction. In fact, Ferrara made no down payment towards any home purchase.

- Finger then paid the innocent seller $360,000 for the home, and dispersed the remaining $251,000 in surplus funding to himself, Wider and the coconspirators, less fees to other parties and small amounts that are used to make a few monthly payments until HTFC could re-sell the mortgage to secondary market investors.

- Using the fraudulent loan application, appraisal report, HUD-1 and other documentation, Wider sold the loan to the secondary mortgage market,

- Every mortgage issued though HTFC in this manner defaults and went into foreclosure.

Some $30 million in toxic mortgages were issued by HTFC in just 11 properties. Net losses are estimated to be at least $7 to $9 million although this investigation is on-going. The identified losses only include those purchases in which one of the indicted defendants acted as a supposed "buyer" of properties whose prices and collateral value were artificially-inflated.

B. Facts Relevant to Defendant Wider's Danger to the Community

Wider and others known to be acting in concert, purchased over 50 properties using the same-day sham transactions outlined above. Wider was involved personally in the chain of title for the same-day sham transactions on 26 real estate transactions.

As HTFC mortgages went into default and foreclosure, and as lenders learned of the fraud, Wider created false documentation to back-date transfers properties in foreclosure, sold or attempted to re-sell properties in foreclosure to others, and obstructed a number of civil proceedings to thwart efforts by creditors to recoup at least a portion of their losses.

For instance, in February 2008, in the case, <u>GMAC Bank v. HTFC Corp.</u>, 06-CV-5291, the Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania sanctioned Wider for what the Court termed "Wider's assault on the deposition proceedings. . .." The court found that Wider's expletive-laden testimony toward an attorney during depositions constituted "hostile" conduct aimed at "impeding, delaying, and frustrating" the proceedings. In August 2008, the district court entered judgment against HTFC in the approximate amount of $14.3 million, monies lost as a result of some of the fraudulent transactions summarized above.

Shortly thereafter, Wider filed a petition for bankruptcy in the Eastern District of New York seeking to discharge millions in debts, including the GMAC judgment, through the fraudulent transfer of properties to other Wider-controlled entities. When deposed and asked to produce supporting documentation for certain claimed transfers, Wider claimed that all of HTFC's books and records had been seized in early 2008, when the mortgage bank's commercial landlord evicted the company from its Garden City office. Wider specifically claimed that the landlord then destroyed all of HTFC's records, and its computers.

During the investigation, the government learned that this testimony was false. HTFC had never been evicted, but instead voluntarily vacated its offices. Correspondence between HTFC and the commercial landlord discuss making sure that Wider left the offices "broom clean." A witness and former associate of the defendant's has advised that he/she helped remove records from HTFC and transport those records to Wider's personal residence.

In an oral decision rendered on January 18, 2012, Eastern District of New York Bankruptcy Court Judge Joel B. Rosenthal denied Wider's petition after concluding that Wider had fraudulently transferred homes in foreclosure using questionable documentation, and made a series of false and inconsistent statements in depositions. "With respect to credibility issues [of the defendant], there were three sides to every story, yours, mine and the truth," Judge Rosenthal wrote. "However, in the case of Mr. Wider there seems to be at least five sides to every story, Mr. Wider's three sides, the other side and the truth."

As in the Eastern District of Pennsylvania case, Judge Rosenthal noted that he was:

> shocked and appalled at the demeanor and attitude of [Wider] in both his live testimony and his video deposition. The level of disrespect for the parties, for counsel and to the Court was

5

>palpable.  * * * Truth, it seems to Mr. Wider, was only an accidental result of these proceedings and not he object or a focus of these proceedings.

In Re: Aaron Wider, Bankruptcy Case No. 8-09-72993 (E.D.N.Y. Jan. 18, 2012), Transcript of Decision at 5-6.

As part of the investigation leading to the instant indictment, the FBI consensually monitored a recorded meeting between a cooperating witness and Wider at Wider's home on October 18, 2012.  During this meeting, acting at the FBI case agent's direction, the cooperating witness ("CW") stated that he/she was on the verge of bankruptcy and asked Wider how he supposedly concealed from bankruptcy court millions in purported additional assets.  WIDER is overheard on the recording giving a lengthy dissertation about how to create forged documentation that could be used to fraudulently transfer properties to keep creditors from recouping losses. "I am smarter than every one of those attorneys out there."  Wider is also heard explaining, "The job is to get rid of the liability.  That's how you make money."

Over the course of the investigation, the government has learned that in conjunction with a lawsuit filed in the Supreme Court of the State of New York, Nassau County, Wider filed an affidavit claiming to have possession of an original note that would pre-date, and therefore defeat claims of ownership by GMAC and Wells Fargo Bank, N.A., two institutions that had come into possession of some of HTFC's toxic mortgages.   In a sworn affidavit to the court, Wider claimed that the banks' promissory notes were "defective, false and fraudulent" and stated that the only valid assignment was the one in his possession, dated December 13, 2011. Wider claimed to have possession of the original note for this property although no such transfers are recorded with county offices.

In another lawsuit pending before this Court and the Honorable Leonard D. Wexler, U.S. District Judge for the Eastern District of New York, Aurora Loan Services LLC v. Wider et al ,11-CV-06111(LDW)(GRB),  Wider proffered in pre-trial proceedings that he possessed a document that would, if authentic, defeat the plaintiff's claims.  Upon inspection during discovery by counsel, as well as through investigation by the FBI, it was discovered that the document proffered by Wider was printed on stationery that had not been manufactured on the date of the purported conveyance of property.  In sum, the document is a forgery.

In April, federal agents executed a search warrant at Wider's present home pursuant to a warrant authorized by the Honorable Arlene R. Lindsay.  Agents discovered that Wider was occupying one apartment in the house, but had tapped into a neighbor's electrical supply, either because his own service was shut off or to evade the payment of utility fees.  The makeshift wiring, coupled with the presence of young children in an upstairs apartment, prompted the FBI to call the local fire department to inspect the wiring to guard against a possible fire hazard.

6

During the search, forensic computer experts imaged the defendant's computer hard drives, and left the original hardware with the defendant. Several days later, the defendant called the FBI case agent claiming that the FBI had wiped all records from his hard drive clean.

At the time of his arrest this morning, federal agents found in plain view inside Wider's residence documents purporting to offer for sale certain properties that are in fact the subject of foreclosure proceedings.

III.   ARGUMENT

  A.   Wider Should Be Detained On Dangerousness Grounds

The facts outlined above regarding defendant Wider's efforts to obstruct and impede the judicial process strongly militates in favor of detention. The defendant has made clear through his conduct that he will go to any lengths to defeat the rule of law and judicial process. Perjury, false statements to investigators, the creation of forgeries, and abusive conduct are routinely employed by this defendant. Moreover, the defendant continues to engage in efforts that inflict economic harm on others.

Given such circumstances, large cash bonds cannot mitigate the very real threat that the defendant poses. Travel restrictions and the posting of collateral "tends merely to assure that [a defendant] will not flee and does not relate to protection of the community." United States v. Colombo, 777 F.2d at 100; United States v. Ferranti, 66 F.3d 540, 543 (2d Cir. 1995)("$1,000,000 bond would have deterred flight, not danger"). The Court of Appeals has expressly held that a bail package that might "reasonably assure the appearance of [the defendant] at trial, will not reasonably assure the safety of the community." United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001).

Insofar as the defendant may offer a secured bond to gain his release, he is barred by 18 U.S.C. §3142(g) from using criminal proceeds as collateral to secure bail, which in this case, includes his personal residence and numerous other residential properties that are now the subject of forfeiture action by the government. Section 3142(g)(4) provides, in pertinent part:

> In considering the conditions of release . . . the judicial officer . . . shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use of collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

The government hereby requests that the Court, should it be willing to consider any proffered collateral, conduct an inquiry to determine the source of such

collateral. Likewise, the government hereby requests a period of time to prepare for a detention hearing at which such collateral may be challenged pursuant to 18 U.S.C. §3142(f)(2).

In sum, there is no reason to assume that defendant Wider's fraudulent and harmful conduct towards creditors and other victims will cease simply because he has been indicted. Accordingly, there can be no reasonable conditions, short of pre-trial detention, that would insure the safety of the community.

B.     The Weight of The Evidence Favors Detention

In United States v. Martir, 782 F.2d 1141 (2d Cir. 1986), the Court of Appeals held that the government as well as the defendant should be able to proceed in bail hearings by way of proffers rather than full-blown evidentiary hearings. Id, at 1145. In affirming the propriety of proceeding by way of a proffer at a detention hearing, the Martir Court stated:

> While the Act is silent concerning how the government is to proceed at a detention hearing, the thrust of the legislation is to encourage informal methods of proof. Congress did not want detention hearings to resemble mini trials.

Id, at 1144-45.

In this case, the grand jury has made a probable cause determination of the defendant's commission of a massive mortgage fraud. The evidence, outlined above, is derived chiefly from real estate transaction records signed by the defendant, and other co-defendants. The false paper trail created by Wider and the others to achieve the objectives of the conspiracy could never permanently conceal the underlying true sales of properties which evidence that the defendant's knowingly and intentionally engaged in a conspiracy to borrow up to 80-percent more from lenders than the worth of the homes they purchased, and then pass along these toxic, immediately defaulting loans, to the secondary market. The evidence of guilt, and of Wider's post-conspiracy obstruction is overwhelming. Indeed, much of it is a matter of judicial determination.

V.CONCLUSION

For the reasons set forth above, as well as any additional facts that the government may present at the detention hearing, the defendant Wider should be held without bail pending trial.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

/S/

By:_____
James Miskiewicz
Assistant U.S. Attorney
(631) 715-7841