UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
UNITED STATES OF AMERICA,                         Docket Number: 14-CR-221

    - against -

AARON WIDER.

            Defendant.
-------------------------------------------------X

# SENTENCING MEMORANDUM

                                      Respectfully submitted,

                                      Richard A. Miller
                                      Jonathan Edward Kirchner
                                      Attorneys for Defendant Wider
                                      356 Veterans Memorial Highway
                                      Suite 3
                                      Commack, New York 11725
                                      (631) 543-3030

TO:

Robert L. Capers
United States Attorney
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

## SENTENCING STANDARDS

As stated by the probation department, per 18 USC 1344, the maximum term of imprisonment is 30 years. The probation department determined that Defendant has a total offense level of 39 and a criminal history category of V, which leads to a guideline imprisonment range of 360 months to life. The probation department, after conducting an analysis, recommends that Defendant Wider be sentenced to 240 months, with 5 years of supervised release. The recommended sentence is substantively unreasonable and should not be followed by the Court. Furthermore, as explained *infra*, the government has not proven any loss in this matter, and thus, the total offense level should be greatly reduced.

A sentence is substantively unreasonable when it is shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing it to stand would damage the administration of justice. United States v. Broxmeyer, 699 F.3d 265, 289 (2d Cir. 2012) (quoting United States v. Rigas, 583 F.3d 108, 123 (2d Cir. 2009). In determining whether a sentence shocks the judicial conscience or is otherwise unsupportable, the Second Circuit uses as its "lodestar the parsimony clause of 18 U.S.C. Section 3553(a), which directs sentencing courts to impose a sentence sufficient, but not greater than necessary to comply with the factors set out in 18 U.S.C. Section 3553(a)(2) namely, retribution, deterrence, and incapacitation." United States v. Park, 758 F.3d 193, 200 (2d Cir. 2014).

When determining the sentence of a Defendant, District Courts should use the Sentencing Guidelines as a "starting point," and then make an independent sentencing determination, taking into account the "nature and circumstances of the offense and the history and characteristics of the defendant," and all of the statutory factors. United States v. Cavera, 550 F.3d 180, 188 (2d

Cir. 2008). The Sentencing Guidelines were rendered advisory by the Supreme Court in United States v. Booker, 543 U.S. 220, 245 (2005). In Kimbrough v. United States, 128 S.Ct. 558, 574 (2007) the Supreme Court held that courts are free to disagree with the Sentencing Commission's estimation of the seriousness of offenses, and to correct for any "unwarranted disparity created by the [Guideline] itself." Sentencing courts are not to "presume that the Guidelines range is reasonable," and instead they "must make an individualized assessment based on the facts presented." United States v. Gall, 552 U.S. 38, 50 (2007). Furthermore, the Second Circuit has "…decline[d] to establish any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable." United States v. Fernandez, 443 F.3d 19, 21 (2d Cir. 2005).

In its 2013 report, the Sentencing Commission noted that the median sentence for fraud is 24 months, both nationally and within this Circuit. See U.S. Sentencing Commission, 2013 Datafile, USSCFY13, Table 7. (http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2013/2c13.pdf). However, even the Guideline itself states that in some instances a downward departure may be warranted. Specifically, Application Note 19(C) Downward Departure Consideration states:

> There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted. For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted.

## THE GUIDELINES RANGE IS INCORRECT
## THE GOVERNMENT HAS NOT PROVEN ANY LOSS

As stated above, the Sentencing Guidelines should be used as a "starting point" in making a determination as to the sentence a Defendant deserves. However, in this case, the Guidelines Range proposed by the Pre-Sentence Report cannot possibly be correct, as the report offers conflicting evidence as to how the loss was calculated, thus not making out a prime facie case of any loss at all. It is the government's burden to demonstrate loss by a preponderance of the evidence, which it has failed to do. See United States v. Salazar, 489 F.3d 555, 557 (2d Cir.2007) (holding that "the statutory requirement to determine a Guidelines range, and do so in the same manner as before Booker, necessarily means that facts relevant to sentencing must be found by a preponderance of the evidence").

Pursuant to the 2015 Guidelines Manual, "loss" is defined as "the greater of actual loss or intended loss." See 2B1.1 Commentary Notes, Application Notes Section 3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." 3(A)(i). "Intended Loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict." 3(A)(ii). The court is permitted to use the "gain" to the Defendant as an alternative measure of loss only where there is a loss that cannot be reasonably determined. 3(B).

To the extent the government is attempting to pile on enhancement points by arguing that the full amount of the loans requested by Defendant is the intended loss, same is expressly prohibited by the Office of General Counsel, U.S. Sentencing Commission's April 2009 Report entitled "An Overview of Loss in USSG Section 2B1.1. To quote said publication at page 5:

> In the case of real property, unless the defendant was so consciously indifferent or reckless as about the repayment of the loans as to impute to him the intention that the lenders should not recoup their loans," intended loss will not likely be the

appropriate measure of loss since the real property serves as collateral and will be recoverable should the owner default.

Even if "intended loss" was an appropriate measurement in this case, it would not help the government, as Defendant did not subjectively intend any loss. "Intended loss is a subjective intent to cause a loss." See United States v. Confredo, 528 F3d 143 (2d Cir. 2008). Furthermore, the USSC has revised the commentary regarding loss to provide that "intended loss" means the pecuniary harm that "the defendant purposely sought to inflict." In this case, Wider had no intent to cause any loss. Rather, the proof at trial was unrebutted. He poured hundreds of thousands of dollars (if not millions worth) worth of renovations into each home in order to increase their value for resale. If it was really a scheme to just steal money from the bank, why would Wider pour substantial monies worth of renovations into the homes he purchased? Why wouldn't he just pocket the money? The answer is because Mr. Wider didn't intend to lose any money at all and had no subjective intent to cause the banks and/or warehouse lenders any loss. Mr. Wider's intent was to purchase properties and renovate them, which he did do until the real estate market crashed.

"Intended loss" is a completely inappropriate measure of loss in this case and therefore the government cannot rely on same. The government must demonstrate actual loss by a preponderance of the evidence, which it has utterly failed to do.

Furthermore, no matter which measurement, Wider is statutorily entitled to "Credits Against Loss" pursuant to 3(E)(iii), which states:

> (iii) Notwithstanding clause (ii), in the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere. In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value.

5

> In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value.

### The Government's Loss Calculation is Internally Inconsistent and Thus Fails to Demonstrate Any Loss

Paragraph 28 of the Pre-Sentence Report lists numerous properties and the properties' associated loss in an Excel-like spreadsheet. The problem is there is no indication as to how the loss was calculated and whether or not Defendant was given appropriate "Credit Against Loss" for each property. An example of the inconsistent "Associated Loss" column is as follows: 1 Catherine Place, No. Bellmore, NY has an associated loss of $220,000. This $220,000 does not represent the amount of loans on the property, as the property was mortgaged in the sum of approximately $520,000. Thus, it seems as if the government did give Wider some "credit against loss" in the sum of $300,000. Is this what the government views is the value of the home ($300,000)? Yet, in the same paragraph, the government argues that 1094 Washington Place, Baldwin, NY has an associated loss of $628,000. This is the same amount of the liens on the home, $628,000. It appears Wider was not given credit against loss on this property.

The above is just an example of the inconsistent and haphazard way the government has calculated the alleged loss in this case. Such inconsistencies make it clear that the government has not met its burden of proof in proving loss, meaning that there has been no loss proven, resulting in no enhancement.

<u>Any Loss Amount Should Not Include Properties Outside the Indictment</u>

In determining the alleged loss in this matter, the government should not be permitted to reference properties outside of the indictment. It is clear that the government's intention is to list as many properties as possible during sentencing to pile on points under 2B1.1. All the properties not listed in the indictment should be excluded from the loss calculation in this matter.

<u>The Loss Cannot be Calculated</u>
<u>In Time the Property will Increase in Value (There is No Loss)</u>

In paragraph 28 of the presentence report, numerous properties are listed with a column representing "associated loss." The loss calculation in this case is inappropriate, as this case in analogous to <u>Butler</u>, in that

> the extent of loss…, if any, could not be calculated, in part because the investors defrauded were able to hold securities purchased…that were impaired, but that might in time prove to possess some or all of the value of the original investments. See <u>U.S. v. Butler</u>, 246 F.R.D. 37, 39.

In this case, the homes have value and many have, or will in the future, be worth the amount of the mortgage on them. Furthermore, the "associated loss" submitted by the presentence report does not even give credit to the value of the homes in most instances. In other words, many times, the associated loss is simply the amount of liens on the home.

<u>Defendant's Loss Calculations</u>

As stated above, the government's loss calculations are fatally flawed, and fail to demonstrate beyond a preponderance of the evidence that there was any loss. As demonstrated in this brief, the Defendant has demonstrated that there was no loss in this matter. However, should the Court disagree, Defendant has conducted loss assessments as well.

There were 18 properties listed in the indictment. It is the Defendant's position that the government cannot use the other properties to calculate any loss. The government calculates the loss associated with the indictment properties at approximately $7.2 million. However, MLSLI.com home values calculates the value of the homes in the indictment at $8,115,000. This calculation was calculated using values given by MLSLI.com. The government cannot dispute the reliability of this source, as the government called the Vice President of said organization as an expert witness at the trial of this matter. See Transcript at page 563. If the presentence report did not credit the value of the properties at all (which is possible, as stated above), there would be no loss in this case at all, rather, there would be a "gain" of approximately $1 million dollars.

This office also hired Barbara Shane as an expert witness to conduct a value of the all the properties. Ms. Shane valued the properties in the indictment at $6,643,000. The presentence report at paragraph 28 indicates that the losses relating to the properties in the indictment are estimated to be approximately $7.2 million dollars. If the presentence report did not credit the value of the properties at all (which is possible, as stated above), there would be next to no loss with respect to these 18 properties.

Ms. Shane calculated the value of the homes listed in the presentence report to be $26,471,053. The presentence report at paragraph 28 indicates that the total losses are estimated to be $19,992,165. If the presentence report did not credit the value of the properties at all (which is possible, as stated above), there would be no loss in this case at all, rather, there would be a "gain" of more than $6 million dollars.

## The Defendant Cannot be Blamed for the Market Crash

As the Court is aware, during the time period of approximately 2007-2008, the housing market crashed. As an example, according to real estate website Zillow.com, Massapequa properties began 2007 with a mean value of approximately $500,000 and bottomed out in 2011 at approximately $380,000, before coming back to a value of about $440,000 today. It is completely inappropriate to blame the loss of values of homes on the Defendant, as he had no control over nationwide market forces. Nationwide, and especially locally, values of homes dropped as much as 25% in the years after the crash.

## The Government is Impermissibly Double Counting the Alleged Loss (There was No Loss)

The PSR states that "as per the Government, the risk of loss is the most accurate representation of actual and guideline loss in the instant case…" The PSR goes on to state that the following losses occurred:

   a. Georgia Banking Company – over $10,000,000
   b. Sovereign Bank – over $15,000,000
   c. First Collateral Services – over $50,000,000
   d. Guaranty Bank – over $2,000,000
   e. Webster Bank – over $2,700,000
   f. GMAC – over $15,000,000
   g. Nomura Bank – over $30,000,000

The first problem with this analysis by the government is that as explained above, "risk of loss" is an entirely inappropriate measure of alleged loss in this case. In this matter, the government alleged that Defendant financed loans by borrowing from "warehouse lenders" such as Georgia Banking Company (see Transcript page 764 et seq.), Sovereign Bank (see Transcript page 1081 et seq.) and First Collateral Services (see Transcript page 925 et seq.) and thereafter Defendant paid back the warehouse lenders by selling the loans to other banks. Yet, even though

the warehouse lenders were paid in full, and sometimes the loans were sold many times thereafter, the government attempts to double, and sometimes triple-count the losses in this matter in hopes that this drives up Wider's offense level so that he serves more time. As stated by the Court in United States v. Vysniauskas, 593 Fed.Appx. 518, 525 (6th Cir. 2015):

> "in a fraudulent scheme, potential losses – however unlikely – may be included in the loss calculation, but double counting is not acceptable."

The Georgia Banking Company witness testified that Exhibit 5801 contained all the loans that were funded by the bank (Trial Transcript page 769-70). There was no testimony that the loans were not paid off. A review of the properties in Exhibit 5801 seems to indicate that these properties were sold to other investors, leaving no loss to Georgia Banking Company. Despite the government's claim of a loss of $10,000,000, the loss to Georgia Banking Company is $0.

According to Sovereign Bank, all loans funded were pain in full or were purchased by other banks, with the exception of four loans: a loan to Daniel McCarthy for $1,575,000; a Bawa loan for $532,000, another Bawa loan for $520,000 and a loan to Dr. Oscar Calderon for $880,000. Sovereign's witness testified that the bank brought foreclosure proceedings against the two Bawa properties (see Trial Transcript at 1091) and thereafter sold the properties to an investor. According to Sovereign's witness, the Calderone property was foreclosed as well and the Bank received $290,000 back on that sale (309 Virginia Avenue, Oceanside, NY) as well as a deficiency judgment of over $750,000 against Calderone. There was no testimony or other evidence produced as to what happened to the McCarthy home. Despite the government's claim of a loss of $15,000,000, the loss to Sovereign is next to nothing.

According to Mr. Nguyen, witness for First Collateral, Exhibit 4800 contained documents relating to the loans that were funded by said company. See Trial Transcript at 927. Loan summaries of the HTFC loans start at Bates 144 of Exhibit 4800 and end at Bates 295. A review

of the loan summaries indicates that every loan was eventually sold to an investor, meaning that First Collateral suffered no losses. Despite the government's claim of a loss of "over $50 million," the loss to First Collateral is $0.

According to Ms. Lantzy, witness for Guaranty Bank, no loans were purchased by said bank, except for 42 Sand Street. See Transcript page 829, 837. A review of the Nassau County Clerk's office reveals that on June 19, 2013, Compass Bank filed documentation with the Clerk alleging ownership of the mortgage. This demonstrates that Guaranty Bank sold or otherwise gave the loan to Compass. Despite the government's claim of a loss of $2,000,000, the loss to Guaranty Bank is $0, or at best, undetermined.

According to Ms. Vitelli-Harris, witness for Webster Bank, Webster Bank, suffered no loss as its loans were sold to another investor. Trial Transcript at 989-990. Despite the government's claim of a loss of over $2.7 million dollars, the loss to Webster Bank is $0.

With respect to GMAC Bank, there is no concrete evidence of an actual loss. Mr. Sullivan testified for GMAC. It is respectfully submitted that his testimony lacked credibility. Firstly, he testified that GMAC was not FDIC insured, which is not true. Page 949. For a person who supposedly intimately familiar with GMAC's practices during the relevant time period, this mistake is devastating to his credibility. He further testified he was only familiar with GMAC's books and records related to loans purchased "to a degree." Page 949. Mr. Sullivan testified that GMAC demanded HTFC repurchase 26 loans that were worth about $13 million dollars. 959. He further testified that he had no knowledge that HTFC did buy them back. Id. However, when Mr. Sullivan was confronted with Exhibit 3500-PS-1, at page 70, he conceded he previously testified he didn't have any knowledge as to damages that GMAC suffered as a result of Defendant's

conduct. 967-968. This glaring contradiction demonstrates that the government has failed to prove any loss to GMAC Bank by a preponderance of the evidence.

Nomura Bank's alleged losses must not be considered by the Court. In order for the Court to have jurisdiction, 18 U.S.C. 1344 mandates that a "financial institution" must be federally chartered or FDIC insured. As Nomura Bank is not FDIC Insured nor federally chartered, any alleged loss suffered by the bank is not admissible. At trial, Ms. Buck of Nomura testified that Exhibit 4803 demonstrated all of the loans that were purchased from HTFC. See Transcript pages 738-740.

Per Exhibit 4803, the following properties were purchased by Nomura, and thus should be excluded from any damages calculation:

> 65 Marine Street, which the government alleges a loss of $418,000
> 69 West Shore Drive, which the government alleges a loss of $437,500
> 2 Lagoon Drive, which the government alleges a loss of $440,000
> 63 Carman Mill Road, which the government alleges a loss of $720,000
> 53 East Grove, which the government alleges a loss of $509,000
> 126 Spring Street, which the government alleges a loss of $447,865
> 14 Scotch Pine Drive, which the government alleges a loss of $304,000
> 14 Kenmore Drive, which the government alleges a loss of $301,600
> 48 Locust Drive, which the government alleges a loss of $191,000
> 19 Carman Blvd, which the government alleges a loss of $217,500
> 107 Margaretta Avenue, which the government alleges a loss of $536,000
> 160-07 111th Street, which the government alleges a loss of undetermined
> 9 Marshall Street, which the government alleges a loss of $353,000
> 308 Neilson Street, which the government alleges a loss of $305,000
> 18 Monroe Avenue, which the government alleges a loss of $348,000
> 2421 Cedar Swamp Road, which the government alleges a loss of undetermined
> 2515 Semeans Neck Road, which the government alleges a loss of $410,000
> 73 Roosevelt Avenue, which the government alleges a loss of $497,100
> 53 E Grove Street, which the government alleges a loss of $509,000
> 61 Madison Street, which the government alleges a loss of $367,000
> 32 Shore Drive West, which the government alleges a loss of $268,000
> 324 Clocks Blvd, which the government alleges a loss of $1,125,000
> 4 Ozone Place, which the government alleges a loss of $379,060
> 9 Mott Street, which the government alleges a loss of $200,000
> 356 Arthur Street, which the government alleges a loss of $520,000
> 336 Clocks Blvd., which the government alleges a loss of $1,200,000

The evidence admitted at trial (per Exhibit 4803), demonstrates the losses the government alleges on the Nomura loans is $11,003,625 (and not over $30 million as alleged in the presentence report). As Nomura purchased these loans, and is NOT FDIC insured, this figure must be subtracted from the government's total loss figure.

Furthermore, Ms. Buck, from Nomura, testified that they resold most of the loans to third parties and/or maturitization trusts. Trial Transcript page 728. This demonstrates there was no loss to Nomura, even if it were FDIC insured. She further testified that numerous loans were packaged into each trust, and that if a borrower stopped paying on an individual loan, nothing would happen to the investors of the Trust, because one loan out of 3,000 in the Trust would not make any difference. 747. Ms. Buck implied that to make any difference to the investors, at least 1/3 of the loans would have to be in default (A Trust of 3,000 loans would have to have at least 1,000 loan defaults). There was no testimony as to what Trusts the HTFC loans were placed into. Buck did not testify that the alleged defaults of the HTFC borrowers led to investors of the Trusts losing any money. Per Exhibit 4803, Nomura allegedly purchased only approximately 100 loans from HTFC. Even if all 100 HTFC loans were placed into the same exact trust, with 2,900 other loans, a default on all 100 HTFC loans would result in no loss to the investors of the Trust, per Buck's testimony. Despite the government's claim of a loss of $30,000,000, the loss to Nomura is $0.

## CONCLUSION REGARDING LOSS AND THE ADJUSTED OFFENSE LEVEL

It is respectfully submitted that the government is entirely incorrect in claiming that the total offense level in this matter is 39. As stated above, the government is seeking a 22 level enhancement due to the alleged loss in this matter. See paragraph 36 of the presentence report. However, as proven above, there was actually little to no loss, and the government certainly has not proven beyond a preponderance of the evidence that there was any loss. Based upon same, without further proof from the government affirmatively demonstrating, beyond a preponderance of the evidence, that there was a loss, there must be no increase pursuant to 2B1.1. This would reduce Wider's total offense level from a 39 to a 17. As Mr. Wider is alleged to have a criminal history score of 11, he would be in the Criminal History Category of V. Using the Sentencing Table, with an offense level of 17 and a criminal history category of V, the sentencing range for Wider should be 46-57 months. It is respectfully submitted that this is the appropriate "starting point" for sentencing purposes.

## ADDITIONAL INFORMATION SHOULD BE PROVIDED BY THE GOVERNMENT REGARDING THE ALLEGED LOSS

It is respectfully submitted that Defendant has demonstrated that there was no loss in this matter. At the very least, Defendant has demonstrated that the prosecution has failed to prove, by a preponderance of the evidence, that there was a loss in this matter. To the extent the Court or the government disagrees, it is respectfully requested that the Court Order a <u>Fatico</u> hearing on this issue. It is respectfully requested that the government explain how it calculated the "Associated Loss" column in paragraph 28 and the losses alleged in paragraph 29 of the Pre-Sentence Report; and explain how the government is not "double counting" losses therein.

# AN ANALYSIS OF THE 3553(a) FACTORS REVEALS THE PROPOSED SENTENCE IS SUBSTANTIVELY UNREASONABLE

The government has proposed a sentence of 240 months. The defense, after demonstrating that the government has failed to prove any loss, proposes a range of 46-57 months. To the extent the Court disagrees with the defense and believes the correct starting point for sentencing purposes is 240 months, said proposed sentence is too high when the 3553(a) factors are analyzed. As relevant to this argument, the factors of said statute are:

> 1. The nature and circumstances of the offense and the history and characteristics of the Defendant;
> 2. The need for the sentence imposed --
>    a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    b. to afford adequate deterrence to criminal conduct;
>    c. to protect the public from further crimes of the Defendant; and
>    d. to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> 3. the kinds of sentence available; ...
>
> 6. the need to avoid unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct; and
> 7. the need to provide restitution to any victims of the offense.

### The Nature and Circumstances of the Offense (3553(a)(1))

With respect to the nature and circumstances of the offense, the alleged crimes did not have any victims, other than banks. The crimes were not violent in any way shape or form. The banks suffered very little loss. The banks did not have clean hands themselves, as many of the banks have been fined and/or had civil and criminal actions brought against them.

<u>The Need to Protect the Public from Further Crimes of the Defendant (3553(a)(2)(c))</u>

With respect to protecting the public from further crimes of the defendant, Wider is an older man with health problems. Rate of recidivism goes down as age goes up. Prior to this case, in 2008, Wider surrendered his banking license. He will not be able to obtain a license in the future. Therefore, it is next to impossible for Wider to commit further crimes of this nature. While defendant had prior run-ins with the law, they were not violent.

<u>The Need for the Sentence Imposed to Provide Defendant with Needed Medical Care (3553(a)(2)(d))</u>

As confirmed by the Pre-Sentence Report, Defendant has suffered from numerous illnesses in his life. Defendant has suffered both physical injuries and has a history of mental health challenges during his life.

<u>The Need to Avoid Unwarranted Sentence Disparities (3553(a)(6))</u>

With respect to avoiding unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, it should be noted that this District frequently hands out sentences for similar conduct which are far lower than the proposed sentence of Mr. Wider. As a matter of fact, the Pre-Sentence Report's recommended sentence far exceeds the sentences given to similar Defendants, as demonstrated by the below cases.

<u>Honorable Frederic Block, Senior Judge's Sentence in</u>
<u>United States v. Parris, 573 F.Supp.2d 744 (E.D.N.Y. 2008)</u>

In <u>Parris</u>, Defendants were convicted after trial of conspiracy to commit securities fraud, six counts of securities fraud, one count of conspiracy to commit witness tampering and one count of witness tampering. <u>Id</u>. at 746. Pursuant to Guidelines Section 2B1.1(a)(1), the base offense levels of Defendants were 7. <u>Id</u>. at 747. Pursuant to the Guidelines there were numerous upward adjustments: 18 levels because the securities frauds caused more than $2,500,000 in loss; 6 levels because the securities frauds involved 250 or more victims; 2 levels because the securities frauds involved sophisticated means; 4 levels because the defendants were officers or directors of a publicly traded company; 3 levels because the defendants were managers or supervisors of criminal activity involving 5 or more participants and 2 levels because the defendants obstructed justice and forged documents and gave false testimony to the SEC. <u>Id</u>. at 747-748.

Judge Block, citing <u>United States v. Adelson</u>, 441 F.Supp.2d 506, 510, 515 (S.D.N.Y. 2006), characterized the <u>Parris</u> case as "another example where the guidelines in securities-fraud prosecution have so run amok that they are patently absurd on their face due to the piling on of points for which the Guidelines have frequently been criticized." <u>Parris</u>, 573 F.Supp.2d at 745.

Judge Block noted that the Defendants were not entitled to any downward departure, and as such, pre-Booker he would have had to sentence them to not less than 30 years, which he viewed as draconian. <u>Id</u>. at 750. The Judge began the sentencing proceeding by correctly calculating the guidelines range, which used as a starting point and initial benchmark. <u>Id</u>. at 751. The Judge next noted that the Guidelines failed to offer any semblance of real guidance. <u>Id</u>. The Judge noted that the parties had provided him with information that demonstrated that the 360 to life guidelines range for the Defendants was much higher than the mean terms of imprisonment

imposed by district courts nationwide for various other crimes, including murder (253.1 months), manslaughter (46.7 months), sexual abuse (103.5 months), robbery (91.5 months), drug trafficking (84.4 months), firearms (82.1 months), racketeering/extortion (95.6 months), pornography/prostitution (98.6 months) and general fraud (26.2 months). Id. at 752. The Court next noted that although the Defendants' crimes were serious, "fairness in sentencing required" that the Defendants' crimes were not "in the same league" as Enron, WorldCom and Computer Associates Defendants. Id. at 754. Upon completing His analysis, Judge Block sentenced the Defendants "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life." Id. at 745.

Of note, Judge Block analyzed the sentences of "fraudsters" who were non-cooperators who caused less than $100 million in losses. Of note, a "Cushing" caused $24 million in losses and was sentenced to 97 months; a "Hotte" caused $67 million in losses and was sentenced to 108 months; an "Adelson" caused $50-$100 million and was sentenced to 42 months. The highest sentence given to a non-cooperator was 108 months, less than half the proposed sentence (240 months) of Wider's.

Judge Block's Sentence in United States v. Butler, 2010 WL 234848 (E.D.N.Y. 2010)

Butler was another case where Judge Block deviated downwards from the sentencing guidelines. Butler was convicted of securities fraud and other offenses. The government argued that Butler should be sentenced to 15 years, based, in part, on the alleged losses, which the government calculated at $1.1 billion. The Sentencing Guidelines called for life imprisonment. Judge Block convened an advisory panel of judges and experts to obtain a recommendation. The panel recommended six to ten years. Judge Block sentenced the Defendant to five years.

18

### United States v. Speight, 14-CR-379 (E.D.N.Y. 2016)

In Speight, Hon. Mauskopf sentenced the Defendant to 42 months in prison. The Defendant had defrauded 72 investors out of $3.3 million by operating a stock scheme via the internet.

### United States v. Oppenheim, 16-CR-049

In Oppenheim, the Defendant, an investment advisor, over the course of seven years, defrauded at least eight of his clients out of $20 million dollars. The Defendant further created fraudulent documents to cover up his theft. The Defendant was sentenced to five years with three years of supervised release.

### Bernie Madoff's Associates

In December 2014, the FBI issued a press release regarding the sentencing of four of Madoff's associates in the S.D.N.Y. Despite causing billions of dollars of losses, Judge Swain sentenced two Defendants to six years, while the two other Defendants were sentenced to two and a half years.

### An Almost Identical Case With a Much Lesser Sentence:
### United States v. Canino, 11-CR-655 (S.D.N.Y.)

The Canino case is almost identical to the instant case. According to a Justice Department press release, Gerard Canino, an individual responsible for a $66 million Long Island Mortgage Fraud scheme, was sentenced to 97 months (less than half of Wider's proposed sentence). Canino's conduct was far worse than the alleged conduct of Mr. Wider. Canino preyed upon

19

innocent homeowners who were in financial distress and convinced said victims to sell their homes to straw buyers. The straw buyers submitted fraudulent documentation to receive loans. When the loans were paid, the conspirators kept much of the money for themselves.

Wider should receive a much lesser sentence than <u>Canino</u>, as the alleged loss is far less than $66 million, there is little to no actual loss in the Wider case, Wider did not keep the monies for himself, rather, he put the monies into renovations of the properties purchased; Wider did not prey upon innocent sellers, rather, the testimony was clear that the innocent sellers were not preyed upon and received just compensation for the value of their homes.

<u>The Need to Provide Restitution 3553(a)(7)</u>

With respect to the need to provide restitution to any victims of the case, there were no victims of this case, except allegedly for banks. Furthermore, as explained elsewhere in this brief, there is no need for restitution, as there was little to no loss; the government is "double counting" any alleged loss.

CONCLUSION

In conclusion, the proposed sentence is substantively unreasonable and should be not be followed. In view of Mr. Wider's period of incarceration of 30 months thus far, it would now be reasonable to grant him time served with a three year period of supervised release thereafter, or such a time period as the court deems just and appropriate under the circumstances.

Dated: Commack, New York
November 3, 2016

Richard A. Miller
Jonathan Edward Kirchner
Attorneys for Defendant Wider
356 Veterans Memorial Highway, Suite 3
Commack, New York 11725
(631) 543-3030