ALB:JAM
F. #2014R00119

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                              Docket No. 14-CR-221(ADS)

AARON WIDER,

           Defendant.

– – – – – – – – – – – – – – – – –X

## THE GOVERNMENT'S SENTENCING MEMORANDUM

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

Allen L. Bode
Artie McConnell
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

A jury has convicted the defendant of orchestrating a massive bank and mortgage fraud conspiracy. Under the guise of his self-established mortgage bank, HTFC Corporation, the defendant fraudulently obtained over $115 million in loan principal from numerous financial institutions by means of false representations, pretenses, promises and forgeries. Between 2003 and 2008, the defendant and his cohorts, all skilled in areas such as banking, real property law, and property appraisal, defrauded lenders by vastly inflating the value of dwellings in Nassau and Suffolk Counties, utilizing straw purchasers and sham trusts to disguise the conspiracy and create the appearance of arms-length transactions, and obtaining millions in mortgage funds under false pretenses. These toxic mortgages were then resold on the secondary mortgage market - relieving Wider of any financial liability - after which the straw purchasers would default on their mortgage payments. Ultimately, each property ended up in foreclosure, while Wider and his coconspirators pocketed millions of dollars in stolen loan proceeds.

As outlined in the Pre-Sentence Report ("PSR") and herein, based on a total offense level of 39 and a criminal history category of V, the Guidelines imprisonment range would be 360 months to life. However, as the statutorily authorized maximum sentence is 30 years, the restricted guidelines term of imprisonment is 360 months. U.S.S.G. § 5G1.1(a).

The sheer magnitude of defendant's theft, his utter lack of contrition, and the incalculable economic harm his conduct has had on the residents and housing market in the Eastern District of New York requires that the Court impose the maximum sentence allowable by law: a 360-month-prison term.

<u>EVIDENCE RELEVANT TO SENTENCING</u>

I.    <u>Overview of the Defendant's Role in the Mortgage Fraud</u>

Wider was president and sole shareholder of a New York State licensed mortgage bank in Garden City, New York named HTFC Corp.  <u>See</u> PSR at ¶ 3.  According to sworn testimony by Mr. Wider in depositions and during his mid-trial bail application, the acronym HTFC stands for "Hit That Fucking Clown."  GX 3000-3005.  Neither Wider nor HTFC possessed any significant assets to originate loans.  <u>See</u> PSR at ¶¶ 9-14.  Rather, Wider and his bank relied on a line of credit with large institutions, commonly called "Warehouse Lenders," to provide the funding for mortgages that would be issued by HTFC.  <u>Id.</u>  As such, a mortgage bank like HTFC would normally review the loan applications of prospective borrowers, ascertain their creditworthiness, and insure that the property being purchased was of sufficient market value to collateralize a mortgage.  <u>Id.</u>  That information would then be forwarded by the mortgage bank to the Warehouse Lenders to obtain funding for specific mortgages.  <u>Id.</u>  Upon getting funding and issuing the mortgage, HTFC could service the loan or sell it to investors in the secondary mortgage market.  In this case, Wider sold every one of HTFC's mortgages to other financial institutions in the secondary mortgage market.  <u>Id.</u>  As so-called "stated" income and asset loans, HTFC's mortgages bore relatively high interest rates (approximately 7% to 10%), and yet were seemingly safe investment options because the loans were represented by HTFC and Wider to be fully collateralized by the real property, as well as the incomes and assets of the purchasers.  <u>Id.</u> Upon buying a mortgage, the secondary market institution paid off the Warehouse Lender, and then either serviced the loans themselves, or bundled the notes with others into collateralized mortgage obligations or mortgage-backed

securities that would be re-sold to other investors such as hedge funds, pension funds, or other investment vehicles.  Id at ¶ 14.

In this case, Wider acted not only as banker screening these loans, but also as mortgagor or borrower on over two dozen fraudulent real estate transactions.  See PSR at ¶¶ 14-15.  Wider also recruited others to act as straw buyers to get funding for home purchases through HTFC mortgages.  Id at ¶¶ 12-15.  The conspirators, including Wider, repeatedly lied about their incomes, manufactured the balances in bank accounts and other assets they claimed to own, concealed their liabilities (including judgments against them in prior civil litigation), and forged signatures and documents on HTFC loan applications.  Id at ¶¶ 8-21.  Those applications were then forwarded to the Warehouse Lenders.  Id at ¶¶ 9, 22.

Wider and the coconspirators then engineered a series of sham transactions on the day they closed on home purchases from innocent third party sellers.  See PSR at ¶¶ 8-19. The purpose of the sham transactions was to artificially-inflate the purported home prices and the supposed market value of the collateral in order to borrow sums of money that were sometimes over 100% more than the true purchase price of the homes.  Id.  Co-defendants John Petiton and Eric Finger, both attorneys admitted to practice law in New York, as well as Joseph Mirando, a New York licensed real estate appraiser, created phony contracts, closing settlement statements, trust agreements and appraisal reports to obtain funding from the Warehouse Lenders for amounts that far exceeded the collateral value of the homes.  Id.  These complex, same-day sham transactions became known as "Aaron Specials" by those privy to them.  PSR at ¶ 10; see also Tr. at 860:21-861:4 (Testimony of Marie Simmons).

As proven at trial, the following summarizes one "Aaron Special" pertaining to 126 Spring Street, Massapequa, New York on February 24, 2006 (See GX 2503, 2502, 4511, 4534):

- At the direction of Wider, the straw purchaser contracted to buy the home from an innocent third-party seller at the negotiated price of $420,000.

- The straw purchaser completed an HTFC loan application requesting funding for a mortgage to buy the same home at the inflated price of $795,000. Wider falsified the statement of assets and income, and the application was forwarded to the Warehouse Lenders.

- At the direction of Wider, real estate appraiser Joseph Mirando prepared an appraisal justifying the $795,000 mortgage request by, among other things, misstating the true sales price and using higher-priced sales as "comparables." In one instance, to justify an inflated purchase price, Mirando favorably compared a dilapidated house located on a truck route adjacent a gas station to a waterfront home with a private boat dock.

- Based on the false HTFC loan application, the Warehouse Lenders approved funding for 80% of the inflated sales price, that is, approximately $636,000.

- At closing, attorney John Petiton oversaw the straw buyer's purchase from the innocent seller at the price of $420,000, and then immediately executed a trust agreement, deed transfer and other documentation to create a false paper trail documenting the inflated transaction of $795,000.

- Simultaneously, HTFC settlement attorney, Eric Finger, who received $795,000 in wire transfers from the Warehouse Lenders, prepared a settlement statement, known as a

HUD-1, in which he concealed the lower, true sales price, and fabricated a down payment that the straw purchaser supposedly made towards the $795,000 fraudulent transaction. In fact, no down payment towards any home purchase was ever made on any of these sham transactions.

- Finger then paid the innocent seller $420,000 for the home, and dispersed the remaining in surplus funding to Wider and the coconspirators, less fees to other parties and small amounts that were used to make a few monthly payments - creating the illusion of a solvent buyer and sound investment - until HTFC could re-sell the mortgage to secondary market investors.

- Using the fraudulent loan application, appraisal report, HUD-1 and other documentation, Wider sold the loan to the secondary mortgage market, falsely representing the mortgage as "investment-grade." Wider and his coconspirators intentionally delayed recoding the falsified title documents, further disguising the scheme from investors and subsequent home purchasers.

- Every mortgage issued through HTFC in this manner defaulted and went into foreclosure.

When HTFC's mortgages went into foreclosure beginning in 2007 and 2008, investors on the secondary market discovered that the actual value of the collateral backing the mortgages was often 80-100% less than the amount that had been borrowed for each property. See PSR at ¶¶ 15-21.

As proven at trial, the defendant and his coconspirators are known to have purchased over 50 individual properties as part of the scheme. However, the defendant often

structured multiple fraudulent transactions for any given property. For instance, between May 2004 and April 2005, there were three separate fraudulent mortgages issued for 14 Carmen Boulevard in Massapequa, New York, which generated almost $2 million in stolen mortgage proceeds. See GX 4556, 3507. To illustrate:

- On May 25, 2004, Aaron Wider purchased the property from an innocent third-party seller for $320,000. That same day, Wider deeded the property to a sham trust created by John Petiton for no consideration. Immediately thereafter, Wider re-purchased the property for $550,000, taking out a $440,000 mortgage through HTFC.

- On December 21, 2004, Aaron Wider deeded the property to GCF Development Corp - an entity wholly owned and controlled by Wider - for no consideration. On the same day, GCF Development Corp sold the property to John Petiton for $800,000. Petiton took out a $600,000 mortgage on the sham purchase, which was processed through HTFC.

- On April 28, 2005, John Petition transferred the property to an entity he created, the Petition Family Trust, for no consideration. That same day, the property was sold to a straw purchaser for $805,000. Two mortgages totalling $744,000 were processed by HTFC.

Thus, in less than one year, Wider and his coconspirators were able to generate $1.78 million in mortgage proceeds using multiple sales of the same property pursuant to the same scheme. As in the above transactions, Wider personally acted not only as the mortgage

banker, but also as the mortgagor or borrower on over two dozen fraudulent real estate transactions.

In sum, as described by the witnesses and proven at trial, the defendant was the chief architect, manager and orchestrator of the entire fraud.

II.     The Defendant's Post-Conspiracy Obstruction of Justice and Efforts to Conceal His Fraud

As lenders, investors, and duped home buyers attempted to recoup their losses from Wider's fraudulent conduct, dozens of civil actions in various jurisdictions were initiated against him and HTFC. In each proceeding, the defendant was disruptive and uncooperative, with his attempts to obstruct justice designed to prevent the discovery of his criminal behavior and allowing the scheme to continue. Perjury, false statements to judges, the creation of forgeries, and abusive conduct were routinely employed by this defendant towards this end. See PSR at ¶¶ 22-26, GX 3000-3106 (deposition and trial testimony).

For instance, in February 2008, in the case GMAC Bank v. HTFC Corp., 06-CV-5291, the Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sanctioned Wider for what the Court termed "Wider's assault on the deposition proceedings." GMAC Bank v. HTFC Corp., 248 F.R.D. 182. (E.D. Penn. 2008). The court found that Wider's expletive-laden testimony toward an attorney during depositions constituted "hostile" conduct aimed at "impeding, delaying, and frustrating" the proceedings. Id. In August 2008, the district court entered judgment against HTFC in the approximate amount of $14,375,295.41, monies lost as a result of some of the fraudulent transactions summarized above. See Id., GMAC Bank v. HTFC Corp., 06-CV-5291, Dkt. No. 91.

Shortly thereafter, Wider filed a petition for bankruptcy in the Eastern District of New York seeking to discharge millions in debts - including the GMAC judgment - through the fraudulent transfer of properties to other Wider-controlled entities.  See PSR at ¶ 26.  When deposed and asked to produce supporting documentation for certain claimed transfers, Wider claimed that all of HTFC's books and records had been seized in early 2008, when the mortgage bank's commercial landlord evicted the company from its Garden City office.  Id.  Wider specifically claimed that the landlord then destroyed all of HTFC's records, including its computers.  Id.  During the investigation, the government learned that this testimony was false.  HTFC had never been evicted, but instead voluntarily vacated its offices.  Correspondence between HTFC and the commercial landlord discuss making sure that Wider left the offices "broom clean."  Id.  Records Wider claimed were destroyed were actually recovered from his residence pursuant to a search warrant in the instant case.

In an oral decision rendered on January 18, 2012, Eastern District of New York Bankruptcy Court, Judge Joel B. Rosenthal denied Wider's petition after concluding that Wider had fraudulently transferred homes in foreclosure using questionable documentation, and made a series of false and inconsistent statements in depositions.  In Re: Aaron Wider, Bankruptcy Case No. 8-09-72993 (E.D.N.Y. Jan. 18, 2012).  "With respect to credibility issues, there [are generally] three sides to every story, yours, mine and the truth," Judge Rosenthal wrote.  Id.  "However, in the case of Mr. Wider there seems to be at least five sides to every story, Mr. Wider's three sides, the other side and the truth."  Id.  As in the Eastern District of Pennsylvania case, Judge Rosenthal noted that he was "shocked and appalled at the demeanor and attitude of [Wider] in both his live testimony and his video deposition. The level of disrespect for the parties, for counsel and to the Court was palpable…Truth, it seems to Mr.

Wider, was only an accidental result of these proceedings and not the object or a focus of these proceedings." Id.

Additionally, over the course of the investigation, the government has learned that in conjunction with a lawsuit filed in the Supreme Court of the State of New York, Nassau County, Wider filed an affidavit claiming to have possession of an original note that would pre-date, and therefore defeat claims of ownership by GMAC and Wells Fargo Bank, N.A., two institutions that had come into possession of some of HTFC's toxic mortgages. In a sworn affidavit to the court, Wider claimed that the banks' promissory notes were "defective, false and fraudulent" and stated that the only valid assignment was the one in his possession, dated December 13, 2011. Wider claimed to have possession of the original note for this property although no such transfers are recorded with county offices. Similarly, in another lawsuit pending before this Court and the Honorable Leonard D. Wexler, U.S. District Judge for the Eastern District of New York, Aurora Loan Services LLC v. Wider et al,11-CV-06111(LDW)(GRB), Wider proffered in pre-trial proceedings that he possessed a document that would, if authentic, defeat the plaintiff's claims. Upon inspection during discovery by counsel, as well as through investigation by the FBI, it was discovered that the document proffered by Wider was printed on stationery that had not been manufactured on the date of the purported conveyance of property. In sum, the document was a forgery, and was so found by the Court.

Wider's illegal conduct was not limited to the Long Island area. In 2004, Wider and HTFC were sued by Guaranty Residential Lending for, inter alia, issuing residential mortgages in the Chicago area to dead people and selling them to Guaranty Residential

Lending on the secondary market.  See Guaranty Residential Lend., Inc. v. International Mortgage Center, Inc., 305 F.Supp.2d 846 (N.D. Ill. 2004).

Not surprisingly, at the time of his arrest in the instant case, federal agents found inside Wider's residence documents purporting to offer for sale certain properties that were in fact the subject of foreclosure proceedings.

III.    The Defendant Stole Over $100 Million in Loan Principal and Created a Loss
        Amount Exceeding $20 Million

The defendant and others known to be acting in concert purchased over 50 properties across Nassau and Suffolk counties during the course of the fraud. The defendant is known to have been involved personally - as a straw purchaser or borrower - in 26 of these real estate transactions.  In doing so, the defendant was able to unlawfully obtain over $115 million in loan principal.  Typically, as proven at trial, each of the conspirators would receive compensation per fraudulent mortgage transaction, and "after everybody was paid, whatever was left" was paid to the defendant.  See Tr. 247:21-248:7.

The defendant claims in his November 11, 2014 sentencing memorandum ("Def. Mem.") that Wider intended to "purchase the properties and renovate them." Def. Mem. at 5.  The reality is that the defendant profited personally and handsomely from the fraud, and was not discreet about the financial success he derived from criminal activity.  He flaunted his wealth "dr[iving] . . . around Massapequa in his Rolls Royce,"  Tr. 607:13 (Testimony of Manjeet Bawa), wearing custom shoes, a fur coat, and a "diamond bracelet, a diamond ring and a diamond Rolex watch." Tr. 608:10-14.  He also frequently spent money on lavish trips to Atlantic City casinos, where he would routinely lose tens of thousands of dollars in a single evening of gambling.  See GX 3300, 3301 (correspondence and records from the Tropicana

and the Taj Mahal).  In another of the defendant's endeavors, he spent several hundred thousand dollars on creating and marketing a music group called "Grooveatech Orchestra," where Wider "produc[ed], compos[ed], arrang[ed] and perform[ed] as vocalist on the record." See http://grooveatech.com/.  In the music video for the Grooveatch Orchestra song "One More Time," Wider displays the limousine that he purchased during the course of the fraud.  See https://www.youtube.com/watch?v=6LiN94mNCuc.

As Wider brazenly spent his ill-gotten gains, each and every property used in the scheme eventually ended up in foreclosure, creating over $20 million in losses[1] for the investors holding the mortgage or mortgage-backed security.

## GUIDELINES CALCULATION

The government agrees with the Probation Department that the 2007 Guidelines Manual is applicable in calculating the defendant's Guidelines range.  See U.S.S.G. § 1B1.11(a).  The government submits that the Guidelines calculation set forth in the PSR and below should be applied:

| | |
|---|---|
| Base Offense Level (§§ 2X1.1, 2B1.1(a)(1)) | 7 |
| Plus: Loss exceeds $20,000,000 (§ 2B1.1(b)(1)(L)) | +22 |
| Plus: Sophisticated Means (§ 2B1.1(b)(9)(C)) | +2 |
| Plus: Gross Receipts of Over $1 Million From Financial Institutions (§ 2B1.1(b)(13)(A)) | +2 |
| Plus: Abuse of Private Trust (§ 3B1.3)) | +2 |

---

[1] As described below, this loss amount was calculated by revisiting the exhibits entered into evidence during trial, specifically, deeds and mortgage documents on file with the Nassau and Suffolk County Clerk's Offices (GX 4500-4521; GX 4550-4557; GX 503-513; GX 601-614; 1104-1118), and secondary sources that collect and organize official County records such as GeoData (GX 3507) and the Multiple Listing Service (GX 3506).

|  |  |
|---|---|
| Plus: Organizer or Leader of Crime Involving Five or More Participants (§ 3B1.1(a)) | +4 |
| **Total Offense Level:** | **39** |

While the numerous instances of contemptuous and perjurious behavior during sworn proceedings provide the basis for assessing additional points for uncharged criminal conduct, the government is already seeking the maximum allowable sentence and thus not seeking an upward departure on this basis. See U.S.S.G. § 4A1.3(a)(1).

The defendant has a criminal history score of eleven, placing the defendant in the criminal history category of V. PSR at ¶ 81. The PSR correctly highlights the defendant's prior convictions, which yield 9 criminal history points. The conduct underlying each of these convictions involve not only the defendant flaunting his ill-gotten material wealth, but also abusive and violent behavior, and even the use of weapons, including firearms. Id at ¶¶ 72-8. Additionally, since the defendant committed the instant offense while on probation, 2 additional points must be assessed. Thus, the defendant's criminal history score is eleven, resulting in a criminal history category of V. PSR at ¶¶ 79-81.

Nothing in the defendant's personal history or background serves to mitigate this history, and in fact should not be relied upon by the Court. For example, the PSR notes that the defendant's medical history was largely provided by Dr. Oscar Calderon. PSR at ¶¶ 100-104. As proven at trial, Dr. Calderon was an active participant and straw buyer on at least one property used during the fraud, 309 Virginia Avenue in Oceanside, New York. See GX 4512, Tr. at 1089:18-23 (Testimony of Mario Dehlikian, employee of Santander Bank, noting that the $880,000 loan was never sold to a secondary investor, nor paid by HTFC or the borrower). Similarly, though Wider told the Department of Probation that his highest level of

education was a year of community college (PSR at ¶ 11), he has frequently stated under oath that he has multiple advanced degrees, including a "double Phd…I have one Ph.D in finance and a Doctor of Arts of Law…[from] Ashford and Hofstra." See, e.g., GX 3002 at 7, GX 3100 at 25. Of course, both institutions have no record of Mr. Wider. The defendant has also fabricated his military record to the Department of Probation, claiming that he deployed on an aircraft carrier and was discharged as the result of "serious injuries." PSR at ¶ 119. The government has obtained Mr. Wider's military record and notes that the reason for his administrative discharge was the result of violent, drunken, and insubordinate behavior rather than medical reasons. In sum, none of the information supplied by Mr. Wider to the Department of Probation should be credited. Nor is it compelling mitigation to the Guidelines calculation.

**Based on a total offense level of 39 and a criminal history category of V, the Guidelines imprisonment range would be 360 months to life. However, as the statutorily authorized maximum sentence is 30 years, the restricted guidelines term of imprisonment is 360 months.** PSR at ¶¶ 129-30, U.S.S.G. § 5G1.1(a).

<u>APPLICABLE SENTENCING LAW</u>

I. <u>Introduction</u>

A criminal sentence must be crafted to adequately reflect, among other things, the seriousness of the offense, the need for respect for the law, and the need to punish the offense and deter future criminal conduct. See 18 U.S.C. § 3553(a)(2). The "starting point" in any sentencing determination, however, remains the United States Sentencing Guidelines. Gall v. United States, 552 U.S. 38, 49 (2007). Although the Guidelines are no longer mandatory, the Supreme Court has made clear that a sentencing court should "consult" the Guidelines and

"take them into account" when sentencing. United States v. Booker, 543 U.S. 220, 264 (2005). The Court has reaffirmed that the Sentencing Commission "continues to fill an important institutional role because it has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise. Accordingly, [the Court] has instructed that district courts must still give respectful consideration to the now-advisory Guidelines and their accompanying policy statements." Pepper v. United States, 562 U.S. 476, 501 (2011) (internal quotation marks, citations, and alterations omitted). Indeed, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." Gall, 552 U.S. at 49; see also United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("Even after Gall and Kimbrough, sentencing judges, certainly, are not free to ignore the Guidelines, or to treat them merely as a 'body of casual advice.'" (quoting United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).

II.    The Defendant's Conduct Caused Over $20 Million in Losses, Warranting a 22-Level Enhancement

The most significant determination to be made while sentencing a defendant pursuant § 2B1.1 is the amount of loss, in dollar value, caused by the defendant's crime. United States v. Turk, 626 F.3d 743, 748 (2d Cir. 2010). The size of the loss directly correlates to the amount that the defendant's offense level is increased, pursuant to a scale in the Guidelines which dictates an increase from anywhere between zero to 30 points. Id.; see also U.S.S.G. § 2B1.1(b)(1)(A)-(P). The Guidelines call for a 22 level increase in the defendant's offense level based upon an actual loss amount of over $20 million. U.S.S.G. § 2B1.1(b)(1)(L). Indeed,

even the most conservative estimate and interpretation of loss in this case shows that the defendant is responsible for well over $20 million supports this increase.

      A.      <u>Applicable Law to Calculate Loss</u>

      The Second Circuit has held that the appropriate way to determine loss in an economic fraud case is to utilize the value of the entirety of the property taken from the victim. <u>United States. v. Arjoon</u>, 964 F.2d 167, 171-72 (2d Cir. 1992). In the context of mortgage fraud, it has been widely established that loss should be measured by the total amount of principal loaned out by mortgage lenders, less any proceeds generated from a foreclosure sale, or if such sale has not occurred, the current market value of the property serving as collateral for the mortgage. See <u>Turk</u>, 626 F.3d at 748-49 ("loss is the principal value of loans . . . made to [the defendant] which were never repaid and which the buildings were supposed to collateralize but never did."); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>United States v. Farano</u>, 749 F.3d 658, 664-65 (7th Cir. 2014) (Posner, J.), <u>United States v. Smith</u>, 705 F.3d 1268, 1275-76 (10th Cir. 2013) ("loss is calculated by subtracting the value of the collateral - or, if the lender has foreclosed on and sold the collateral, the amount of the sales price - from the amount of the outstanding balance on the loan"). The deduction of any proceeds from a foreclosure sale or the current market value of the collateral from the loss total is consistent with the sentencing guidelines, which instruct that a credit should be apply to reduce the size of the loss "in a case involving collateral pledged or otherwise provided by the defendant." U.S.S.G. §2B1.1, Application Note 3(E)(ii). Thus, calculating loss in this and similar scenarios requires a two-step process: first, the determination of the foreseeable pecuniary harm resulting from the fraud, and second, the determination of any credits against loss from sale of the collateral, as required by Application Note 3(E)(ii). See <u>Turk</u> at 748-50, citing <u>United States v. Mallory</u>, 709 F.Supp.2d 455

(E.D.Va. 2010).   Under the plain reading of U.S.S.G. §2B1.1, all "relevant conduct" is applicable in the sentencing context, and need not be limited by the properties or victims mentioned in the indictment.   See, e.g., United States v. Cavallo, 790 F.3d 1202, 1232–35 (11th Cir. 2015) (district court did not err in mortgage fraud conspiracy case by including in its loss calculation properties for which defendant was not charged and properties named in counts on which the defendant was acquitted).

    With respect to the foreseeability of loss from the fraud, courts considering facts similar to the instant case have all held that the only loss that need have been foreseeable to the defendant is the loss of the unpaid principal.   See Id.   For example, as in this case, the defendant in Mallory defrauded not individual investors but banks, using "fraudulent tax returns and employment and asset verification letters" to portray unqualified borrowers as financially qualified "for home loans that they otherwise would not have received."   709 F.Supp.2d at 456.   As in this case, the defendant in Mallory "argued that he should not be held responsible for the diminished foreclosure sale value of properties…as the market downturn that caused the decrease in value was not reasonably foreseeable to him at the time of his fraudulent conduct."   Id.   The court declined to follow this reasoning, and required foreseeability of the loss of the unpaid principal, but not with respect to the future value of the collateral, stating "[this approach] is not merely the best reading of § 2B1.1; it is also necessary to ensure that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct…Put another way, a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct." Id at 459.   See also   United States v. Mshihiri, 816 F.3d 997, 1011 (8th Cir. 2016)

("[W]e have recognized that it was reasonably foreseeable that a scheme premised on false loan applications and inflated real estate prices would unravel, and that market conditions could exacerbate the losses." (quoting United States v. Engelmann, 720 F.3d 1005, 1013 (8th Cir. 2013) (quotation marks and alteration omitted))).

The Second Circuit adopted the same rationale in Turk, stating that to do otherwise "would be to encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk." Turk at 750. See also United States v. Morris, 744 F.3d 1373, 1375 (9th Cir. 2014) (credit to which defendant was entitled was only amount banks actually recovered from sale of subject properties); United States v. Crowe, 735 F.3d 1229,1231 (10th Cir. 2014) (whether proceeds ultimately realized from foreclosures were reasonable foreseeable to defendant was not relevant); United States v. Stream, 856 F.Supp.2d 276, 278 (D.Mass. 2012) (loss amount for sentencing bank fraud defendants was outstanding loan amount minus what the bank later recovered). This rationale not only applies to the first subsequent purchaser of the fraudulently inflated property, but to successive purchasers and investors as well. See, e.g., United States v. Hymas 780 F.3d 1285, 1293 (9th Cir. 2015) ("the district court did not err by considering the losses submitted by successor lenders who had purchased the loans. The losses to those lenders are considered reasonably foreseeable pecuniary harm because the lenders purchased the loans without an awareness of [their] true value due to…fraud.")

The District Court is not required to determine loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information. U.S.S.G. §2B1.1 cmt. n. 3(C) ("The Court need only make a reasonable estimate of the loss."); United States v. Binday, 804 F.3d 558, 595-96 (2d Cir.

2015) (holding that the District Court acted appropriately in estimating loss in an insurance fraud case, even if the method utilized admittedly would not result in calculating loss with actual precision); United States v. Coppola, 671 F.3d 220, 249-50 (2d Cir. 2012) (upholding the District Court's practice of utilizing an "extremely conservative estimate" in a racketeering and economic fraud case); United States v. Guang, 511 F.3d 110, 123 (2d Cir. 2007) (reaffirming that the Court can rely on testimony to determine an estimated loss amount during an extortion case). It is appropriate for the Court to rely on the testimony from trial and exhibits admitted into evidence when making a sentencing determination. See United States v. Concepcion, 983 F.2d 369, 387-88 (2d Cir. 1992) (holding that the Court may consider "any information known to it, so long as the defendant had an opportunity to respond in order that the Court not rely on misinformation").

B. Methodology and Calculations

Applying the standard delineated in Turk and other cases to the instant facts, to determine loss in the instant case, the starting point is the amount of loan principal obtained pursuant to the scheme. As proven at trial, the defendant sourced over $115.6 million[2] in principal from fraudulent mortgage loans across numerous financial institutions. Next, from this amount, the Court must deduct any proceeds from a foreclosure sale, or the current market value of the collateral, from the loss total. See U.S.S.G. §2B1.1, Application Note 3(E)(ii) (credit should be applied to reduce the size of the loss "in a case involving collateral pledged or otherwise provided by the defendant").

---

[2] This does not include First Collateral Services, a warehouse lender who lent out $57.8 million in principal on mortgage loans, but did not suffer any actual loss. See Trial Tr. ("Tr.") at 939:19-24 (Testimony of Kumiko Nguyen, employee of First Collateral Services).

The government agrees with the Department of Probation that losses attributable to the defendant's scheme were in excess of $30,000,000, and the PSR itemizes just under $20,000,000 of "known and estimated losses," representing a "portion of the fraudulent activity." PSR ¶¶ 28-30. The PSR is correct in noting that the baseline for actual, incurred losses is $14.3 million, which is the judgement amount that one of the victim banks, GMAC Bank, obtained against HTFC for its procurement and sale of 26 toxic mortgages. See PSR ¶ 29; GX 5500; see also Tr. at 959:18-25 (Testimony of Paul Sullivan, former employee of GMAC Bank).

Yet even using the most restrained and conservative calculations under this approach, the defendant's scheme caused **a minimum of $18,944,299 in actual losses** regarding properties that were foreclosed on or otherwise sold to third parties. Regarding properties that are currently in some state of foreclosure, the government has calculated **a minimum of $3,543,500 in estimated losses**. These amounts were calculated using exhibits entered into evidence during trial, namely, deeds and mortgage documents on file with the Nassau and Suffolk County Clerk's Offices (GX 4500-4521; GX 4550-4557; GX 503-513; GX 601-614; 1104-1118) showing transfers of title and sales of the property, as well as secondary sources that collect and organize official County records regarding real property transfers, such as GeoData (GX 3507) and the Multiple Listing Service (GX 3506). The following calculation omits properties used in the scheme where the chain of title could not be determined, market value could not be reliably estimated, or where a sale was not adequately documented. Nevertheless, **the aggregate loss amount using these conservative standards is $22,487,799.**

1. <u>Actual Losses</u>

As stated previously, the following are losses where the amount dispersed by a financial institution in the fraudulent mortgage is offset by the amount recouped in a consummated, documented foreclosure sale or sale to a third party. Notably, in some instances, Wider filed a false satisfaction of mortgage prior to the sale in order to create the appearance of clean title, which was a condition precedent to the sale.[3] By doing so, Wider deprived the institution that held the mortgage the entire amount of the loan.

| Address | Loss After Sale |
|---|---|
| 107 Margaretta Avenue Massapequa | $536,000 |
| 1094 Washington Place Baldwin | $628,000 |
| 115 Spray Street Massapequa | $420,00 |
| 126 Spring Street Massapequa | $474,000 |
| 13 Quail Run Massapequa | $648,000 |
| 14 Marshall Street Massapequa | $640,000 |
| 1428 Meadowbrook Road North Merrick | $272,000 |
| 1571 Bellmore Avenue North Bellmore | $382,500 |
| 207 North Rutherford Avenue Massapequa | $399,200 |
| 2550 Jerusalem Avenue North Bellmore | $231,750 |
| 2821 Beach Avenue Bellmore | $524,050 |
| 29 Quail Run Massapequa | $433,000 |
| 336 Clocks Boulevard Massapequa | $930,000 |
| 356 Arthur Street Freeport | $520,000 |
| 4 Ozone Place Massapequa | $499,060 |

[3] For example, regarding 14 Marshall Street, the defendant filed a false satisfaction on an unrecorded loan in order to sell the property. The false mortgage satisfaction is notarized by a "notary republic." Several mortgage satisfactions on Wider properties are conspicuously notarized by a "notary republic."

| | |
|---|---|
| 42 Sands Street<br>Massapequa | $588,000 |
| 44 Sands Street<br>Massapequa | $562,500 |
| 475 Atlantic Avenue<br>Massapequa | $500,000 |
| 53 East Grove<br>Massapequa | $509,000 |
| 63 Carmen Mill Road<br>Massapequa | $720,000 |
| 65 Marine Street<br>Massapequa | $418,000 |
| 69 West Shore Drive<br>Massapequa | $437,500 |
| 73 Roosevelt Avenue<br>Massapequa | $497,100 |
| 77 Stone Boulevard<br>Massapequa | $380,100 |
| 885 Wantagh Avenue<br>Wantagh | $622,400 |
| 9 Marshall Street<br>Massapequa | $353,000 |
| 61 Madison Street<br>Massapequa | $367,000 |
| 2530 Peconic Avenue<br>Seaford | $511,936 |
| 151 Frederick Avenue<br>Floral Park | $632,000 |
| 195 Cedar Swamp Road<br>Glen Head | $269,000 |
| 14 Scotch Pine Drive<br>Islandia | $401,500 |
| 309 Virginia Avenue<br>Oceanside | $510,000 |
| 14 Kenmore Avenue<br>Copaigue | $432,000 |
| 143 Ontario Avenue<br>Massapequa | $394,000 |
| 2917 Kane Avenue<br>Medford | $410,000 |
| 2 Lagoon Drive<br>Copaigue | $889,903 |
| 2421 Cedar Swamp Road<br>Glen Head | $642,800 |
| 1004 North Broadway<br>Massapequa | $359,000 |
| **TOTAL LOSS AMMOUNT** | **$18,944,299** |

2.  <u>Estimated Loss from Unrealized Sales</u>

These properties are still owned by Wider or one of the other coconspirators,

and remain in some state of foreclosure. Many of these homes have been neglected and are in extreme states of disrepair, as the defendant and coconspirators refuse to maintain them, and the foreclosing banks do not yet have title and therefore have little interest in upkeep or renovations. The loss regarding such "zombie homes" - which "fester with rats, mold, weeds and squatters" and "ruin the quality of life for neighbors, threaten public safety and send property values plummeting" - must therefore be estimated by subtracting the market value of the property from the amount of loan principal fraudulently obtained. [4] Notably, the below calculations do not factor in the innumerable fines, legal costs, and other expenses associated with a foreclosure.

| Address | Estimate Loss | Comments |
|---|---|---|
| 1 Catherine Place North Bellmore | $220,000 | This property is still owned by Manjeet Bawa |
| 18 Monroe Avenue Massapequa | $323,000 | This property is still owned by John Petiton |
| 1800 Newbridge Road North Bellmore | $204,000 | This property is still owned by Manjeet Bawa |
| 32 Shore Drive Copaigue | $268,000 | This property is still owned by Wider and appears to be rented |
| 324 Clocks Boulevard Massapequa | $1,125,000 | This property is still owned by Wider and appears to be rented |
| 83 Shell Street Massapequa | $255,000 | This property is still owned by Joseph Ferrara |
| 9 Mott Street Massapequa | $740,000 | This property is still owned by Wider and appears to be rented |
| 19 Carman Boulevard Massapequa | $217,500 | This property is still owned by Joseph Ferrara and appears to be rented |
| 48 Locust Drive Amityville | $191,000 | This property is still owned by Joseph Ferrara |
|  | **TOTAL ESTIMATED LOSSES** | **$3,543,500** |

---

[4] Long Island has been dubbed the "epicenter" of the "Zombie Home" problem. See "Zombie Houses: A Newsday and News 12 Special Report," available at http://data.newsday.com/projects/long-island/zombie-houses/.

Accordingly, **the minimum aggregate loss amount is $22,487,799**, warranting a 22-point increase under U.S.S.G. § 2B1.1(b)(1)(L).

III.    The Specific Offense Characteristics Warrant an Additional 10-Level Enhancement

The Government agrees with the remaining findings of the PSR, which recommend that an additional ten points be added to the defendant's offense level.

A.    The Scheme Employed "Sophisticated Means"

A two-point increase in the offense level is justified when the offense involved "sophisticated means," defined as involving "complex and intricate" methods. U.S.S.G. § 2B1.1(b)(10)(C). As described above, the defendant orchestrated an extremely complex fraud, requiring a tremendous amount of planning; multiple individuals with special skills in law, banking, real estate, and accounting; and the preparation of hundreds of thousands of falsified and forged documents. Indeed, the use of trust entities and their corresponding bank accounts - which operated in a manner similar to "nominee accounts" and "corporate shells" in the sham transactions - would, standing alone, justify a two-level increase. U.S.S.G. §2B1.1 comment. n. 9(B) (listing "corporate shells" as an example of sophisticated means); PSR at ¶ 60.

B.    The Scheme Derived Over $1 Million in Gross Receipts from Financial Institutions

A two-point enhancement in the offense level is appropriate when the defendant derived more than $1 million in gross receipts from one or more financial institutions. U.S.S.G. § 2B1.1(b)(16)(A). As detailed in the PSR and as evidenced above, the

defendant sourced millions in gross receipts from numerous financial institutions. Therefore, an additional two-levels is proper. See PSR at ¶ 61.

C.     The Defendant Abused a Position of Private Trust

A two-point enhancement is appropriate when the defendant abused a position of "private trust" in a manner that significantly facilitated the commission of the fraud. U.S.S.G. § 3B1.3. "Private trust" refers to a position "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Id. The Guidelines note that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."

Wider's role as a mortgage banker licensed with the state of New York, his unfettered ownership and operation of HTFC (which originated and underwrote the fraudulent mortages), and his fiduciary role vis-à-vis borrowers, warehouse lenders, and secondary market investors, clearly qualifies as a position of "private trust" that was wholly abused. A two-point enhancement on this basis is properly assessed in the PSR. PSR at ¶ 63.

D.     The Defendant Was the Mastermind and Leader of the Conspiracy

The defendant's role as organizer and leader of the conspiracy, which involved five or more participants, warrants another four-levels of increase. U.S.S.G. § 3B1.1(a); see also PSR at ¶ 64. As evidenced by the testimony of coconspirator Eric Finger, the defendant was the chief architect, supervisor, and critical actor in the fraud at every stage. Finger, who pled guilty to his role as closing attorney in Wider's scheme, succinctly explained Wider's role as follows:

"Mr. Wider was essentially – he controlled – he organized this entire transaction. He owned the bank [HTFC], he underwrote or processed and approved the straw buyers for their loans, he ordered the paperwork to be sent to my office and be signed on the date of closing, and authorized his warehouse line or lender to send the money to my escrow account for funding. He worked with the appraisers to obtain an appraisal value he needed in order to lend money at the elevated price. He found the various borrowers because we had a few different borrowers that would act as the straw borrowers who actually took out mortgages . . ."

Tr. at 246:21-247:11 (Testimony of Eric Finger). Thus, a four-level increase is proper.

IV.    The Defendant's Total Offense Level is 39

As calculated above, beginning at a base level offense of 7, the defendant is increased 22 levels for causing over $20 million in loss, as well 10 additional levels due to the specific offense characteristics. Thus, the total offense level to be utilized at sentencing is 39.

THE GUIDELINES DO NOT ACCURATELY QUANTIFY THE SCOPE AND IMPACT OF THE DEFENDANT'S CONDUCT

Beyond the financial institutions that were damaged by the defendant's fraud, his behavior has had an incalculable effect on the residents and housing market in the Eastern District of New York and beyond. This impact should not be ignored when considering the defendant's sentence. See United States v. Karro, 257 F.3d 112, 121 (2d Cir. 2001) (discussing how even "the risk of non-monetary harms…[are] a permissible basis for an upward departure" from the sentencing guidelines.) Indeed, it has been estimated that "Zombie homes," like those created by the defendant's conduct, have cost Long Island "at least $295 million in depreciated home values," according to a real estate appraiser's analysis. See "Zombie Houses: A Newsday and News 12 Special Report," available at http://data.newsday.com/projects/long-island/zombie-houses/. Similarly, as proven at trial, many of the defendant's toxic mortgages were securitized and ended up in pension funds and

other investment vehicles, causing an unknowable number of individuals to feel the effect of the defendant's conduct. The defendant even ruined the lives and credit of his coconspirators, specifically the straw buyers, as demonstrated by the trial testimony of Alex Christie and Manjeet Bawa.

Innocent homebuyers were also duped. A November 2007 Newsday exposé on the defendant and his scheme chronicled the stories of families who suffered at the expense of the fraud. See Randi F. Marshall, Banker's Alleged Tactics Exposed, Newsday, Nov. 18, 2007, at A22. These homebuyers were manipulated and misled into purchasing overvalued properties whose values had been inflated through the defendant's scheme.

For example, Robin and William Fitzgerald, who collectively earned approximately $100,000 annually, utilized HTFC as their mortgage bank in 2005 to purchase a home in North Massapequa for $805,000. Id at A23. The defendant told the Fitzgerald's that because he was a mortgage banker, he could approve a loan that other banks wouldn't, and allow them to realize their dream of being homeowners. Katie Thomas, Too Good to be True?, Newsday, Nov. 18, 2007, at A28. The defendant and HTFC fraudulently overstated their annual income on the loan application, and the Fitzgeralds predictably struggled to make mortgage payments. Marshall at A23. Approximately one year after purchasing the home, GMAC bank, who had bought the Fitzgerald's loan from HTFC, began foreclosure proceedings. Id. After retaining an independent appraisal as a result of these proceedings, the Fitzgerald's learned that the true value of their home was $545,000, a far cry from the $805,000 price they paid. Id.

Years of ancillary civil litigation have also been a predictable consequence of the defendant's fraud, and losses associated with such proceedings are still being incurred at

present. For example, the government has been contacted by Fidelity National Title Group ("FNTG"), who detailed the resources required to defend a homeowner in an ongoing quiet title action against a foreclosing bank involving one of the properties at issue. FNTG has already accumulated over $30,000 in legal fees, and it is anticipated that they will continue to accumulate. Undoubtedly, this is not an isolated circumstance. While it would be impossible to calculate the additional expenses the defendant's criminal activity has brought to other related stakeholders like FNTG, these subsidiary costs should not be overlooked when determining the defendant's sentence.

## THE DEFENDANT DESERVES THE MAXIMUM SENTENCE ALLOWABLE BY LAW

As stated previously, the defendant's offense level is 39 and criminal history category is V. According to the U.S.S.G Sentencing Table, the recommended range for sentencing would be 360 months to life. However, the statutorily authorized maximum sentence pursuant to 18 U.S.C. §§ 1344 and 1349 is not more than 30 years. Therefore, the restricted guideline term of imprisonment is 360 months. PSR at ¶ 130.

The defendant has earned and deserves the maximum sentence. His brazen conduct; his attempts to obfuscate and corrupt financial institutions, innocent homebuyers, and the judicial system; and his utter lack of contrition, all warrant a severe incarceratory sentence that will punish the defendant and deter others from engaging in similar illegal activity. A 360-month sentence is both necessary and appropriate to achieve the goals of

sentencing, <u>see</u> 18 U.SC. § 3553(a)(2), which, in this case, is within the applicable

Guidelines range of imprisonment.

Dated:     Central Islip, New York
           November 8, 2016


                              Respectfully submitted,

                              ROBERT L. CAPERS
                              United States Attorney

                    By:    __/s/_____
                              Allen L. Bode
                              Artie McConnell
                              Assistant U.S. Attorney
                              631-715-7825


cc:    Richard Miller, Esq. (by ECF)
       Linda Fowler, United States Probation Officer (by E-mail)